```
UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )
                               )         No. S-05-0413 DLJ
Aida Magana,                   )
                               )
            Defendant.         )         ORDER
                               )
_____)
```

On March 23, 2006, Aida Magana (Defendant) filed a motion to suppress evidence that was obtained during a stop of the vehicle that she was driving. An evidentiary hearing on the motion was held on July 3, 2007 and the parties have now submitted written arguments on the motion. Having considered the papers submitted, the testimony at the evidentiary hearing, and the applicable law, the Court finds that officers had reasonable suspicion to stop Defendant's vehicle and accordingly, DENIES the motion to suppress.

**Factual Background**

On September 5, 2005 Drug Enforcement Administration (DEA) agents received information that mobile telephone number 530-570-2073 was being used by Gerardo Silva (Silva) to carry out drug transactions and obtained an administrative subpoena for the telephone records associated with that number. See United States Opposition to Defendant's Reply Brief, Exhibit A (hereinafter, Exhibit A) at 3. On September 8, 2005, a DEA confidential source placed a phone call to this mobile telephone number, spoke to Silva about purchasing narcotics and set up a tentative meeting date of September 19, 2005. Exhibit A at 3. On September 14, 2005 DEA learned from the telephone company that the subscriber for the mobile telephone number was "Gerardo Magaqa" whose California driver's license number was A9096330, and that the address listed

for the telephone was a PO Box in Chico, California.  Exhibit A at 3.  Agents ran the driver's license number and found that it belonged to "Gerardo Magana Silva".  The mobile telephone records also listed a secondary phone number for Silva.  Exhibit A 3-4.  Agents issued an administrative subpoena for records associated with the secondary telephone phone number and learned that it was for a landline telephone number located at 1865 Devonshire Road in Chico, California and that the subscriber was listed as "Gerardo Magana".  Exhibit A at 4.

The confidential source spoke to Silva on September 19, 2005 about obtaining a methamphetamine sample and the two agreed to meet the following day.  Exhibit A at 5.  On September 20, 2005 at 9:45 a.m., in anticipation of the meeting between Silva and the source, law enforcement officers set up surveillance at 1865 Devonshire Road.  See Transcript from July 3, 2007 Evidentiary Hearing (hereinafter, Transcript) at 7.  Agents observed a red Ford Mustang parked at the residence, ran its license plates and learned that it was registered to "Aida Anna Magana" – the Defendant in this case. Transcript at 5-6.  Based on this information, agents obtained Defendant's driver's license record and learned that she used the same Chico post office address for her license and vehicle registration that Silva used for his driver's license.  At approximately, 9:45 a.m. agents observed a man, later identified as Silva, and a woman leave the Devonshire Road residence in the Red Mustang, driven by Silva.  Exhibit A at 6.  Approximately forty-five minutes later the Mustang was observed arriving at the meeting

2

location.  Exhibit A at 6.  According to agents, the vehicle was driven at this time by a female and Silva was in the passenger seat of the vehicle.  See Declaration of Special Agent Brian Swenson at 1.[1]  Silva exited the Mustang and got into the confidential source's vehicle where he handed the source a sample of methamphetamine.  Exhibit A at 6.  Silva then returned to the Mustang and left the meet location.  Exhibit A at 7.

The confidential source and Silva agreed to meet again on September 27, 2005 for the sale of 2.5 pounds of methamphetamine. Exhibit A at 8.  On that date at approximately 8:00 a.m. law enforcement agents taking part in the operation were briefed and provided a copy of Aida Magana driver's license photo.  Transcript at 8, 49.  Around 10:30 a.m. agents conducting surveillance at the Devonshire Road residence observed the red Mustang, which was driven by Silva with no passengers, leave the residence and travel directly to a meet location at a shopping center 1.7 miles away. Exhibit A at 8, Transcript at 10.  At approximately, 10:57 a.m. Silva delivered 2.5 pounds of methamphetamine to the undercover source and was promptly arrested.  Transcript at 12, 13-15.  Before being apprehended, Silva ran approximately thirty feet, turned his back and broke his mobile telephone apart.  Transcript at 12.

Meanwhile, agents continued to surveill the Devonshire Road residence.  At some point between 11:20 a.m. and 11:25 a.m. agents

---

[1] Other declarations support a conclusion that the woman was a passenger and not the driver.  The court finds that the record does not establish who was driving the car at this time, but it is sufficient to show the presence of Silva and a woman at the scene.

3

observed a black pickup truck leave the residence. Transcript at 46, Exhibit A at 10. The surveillance team informed their colleagues, who had arrested Silva, that a vehicle had left the Devonshire Road residence. Transcript at 46, 47. The sale location agents instructed the surveillance team to stop the vehicle and identify the occupant, which was done. Transcript at 47. The agents approached the vehicle, which was driven by a woman, and asked if she was "Aida". Defendant responded that she was. Transcript at 48. Defendant Magana informed the officers that her husband had given her instructions before he left that if she did not hear from him that she should take a plastic bag he had packed and leave the house. Exhibit A at 11. Defendant consented to a search of the vehicle and agents found .5 pounds of methamphetamine in a crystalline mixture, digital scales, over $7,000 in currency and some cocaine inside of a purse. Exhibit A at 11, 12. Defendant also consented to a search of the Devonshire Road residence that she shared with Silva. Agents searched the residence, did not find any contraband and placed Defendant under arrest. Exhibit A at 12.

**Discussion**

**A.   Legal Standard**

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. Amend. IV. A person is seized within the meaning of the Fourth Amendment when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to

leave." See United States v. Mendenhall, 446 U.S. 544 (1980). The law is well settled that a stop of a vehicle entails a seizure of its occupants. See e.g. Brendlin v. California, 127 S. Ct. 2400 (2007). This is the case even if the "purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648 (1979).

The Fourth Amendment, however, does not prohibit all seizures-- only unreasonable ones. The Supreme Court has held that a vehicle stop (and the seizure of its occupants) is reasonable within the meaning of the Fourth Amendment, and therefore permissible, if it is justified at its inception and reasonably related in scope to the circumstances which justified the stop in the first place. See e.g. United States v. Jimenez-Medina, 173 F.3d 752, 754 (9th Cir. 1999). In order for a stop to be justified at its inception, a law enforcement officer must have "reasonable suspicion". Id. Reasonable suspicion requires that the officer has knowledge of specific, articulable facts which together with "objective and reasonable" inferences, form a basis for suspecting that a particular person is engaged or about to be engaged in criminal conduct. See Terry v. Ohio, 392 U.S. 1, 20 (1968); United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir. 1989). No rigid test or neat legal rule is used to assess when this standard is met. Terry, 392 U.S. at 8. While a law enforcement officer's "inchoate hunch" or "unparticularized suspicion" is insufficient, the standard is "considerably less than proof of wrongdoing by a preponderance of the evidence" . . . and "obviously

1  less demanding than that for probable cause." See Terry, 392 U.S.
2  at 8; United States v. Sokolow, 490 U.S. 1, 8 (1989).  The approach
3  is intended to be flexible and provide law enforcement officers
4  with a tool to investigate suspicious activity.  See United States
5  v. Sharpe, 470 U.S. 675, 685 (1985)("Much as a 'bright line' rule
6  would be desirable, in evaluating whether an investigative
7  detention is unreasonable, common sense and ordinary human
8  experience must govern over rigid criteria").  Therefore, in
9  assessing whether law enforcement had reasonable suspicion to
10 conduct a stop, a court looks at the totality of the circumstances
11 Id.  To determine what factual circumstances were known to an
12 officer at the time of a stop, a court looks at the "collective
13 knowledge" of all of the officers involved in the investigation
14 even though some of this information might not have been
15 communicated to the officer directed to make the stop.  See e.g.
16 United States v. Sutton, 794 F.2d 1415.  Additionally, the U.S.
17 Supreme Court has stated that the factual circumstances must be
18 evaluated in light of the training and experience of the officer
19 because some patterns of behavior which may seem innocuous to the
20 untrained eye may not appear so innocent to the eye of the trained
21 police officer.  See e.g. United States v. Cortez, 449 U.S. 411,
22 418 (1981)("evidence thus collected must be seen and weighed not in
23 terms of library analysis by scholars, but as understood by those
24 versed in the field of law enforcement.")

**B.   Analysis**

In her moving papers Defendant argues that the stop was

6

unlawful because officers lacked reasonable suspicion.  As support for this position, Defendant cites the officers' reports which state that the purpose of the stop was to "contact/identify all of the parties as they may be connected with the criminal investigation that was occurring."  Defendant's Motion to Suppress (hereinafter, Def. Motion to Supp.) at 7.  According to Defendant, this statement confirms that the officers did not have any articulable information that the driver was involved or about to be involved in criminal conduct.  Def. Motion to Supp. at 7.  Defendant asserts that the only information officers possessed at the time of the stop was that a similar vehicle had been seen at 1865 Devonshire Road on prior occasions.  Def. Motion to Supp. at 7.  Defendant argues that this is insufficient to establish reasonable suspicion.  Defendant states that based on the facts that were known to the officers at the time of the stop, at most, officers had probable cause to believe that there were drugs located at 1865 Devonshire and could have obtained a search warrant for the residence.  Def. Motion to Supp. at 8.  Defendant points out, however, that even had officers obtained a search warrant for the residence, the warrant would not have provided a basis to stop and detain Defendant.  Def. Motion to Supp. at 8.  Defendant cites <u>Michigan v. Summers</u>, 452 U.S. 692 (1981) for the proposition that officers executing a search warrant of a residence may detain individuals who are present at the residence at the time of the search.  Def. Motion to Supp. at 8-9.  Defendant states, however, that <u>Summers</u> does not provide a lawful basis for the detention in

7

this case because even if police had obtained a search warrant for the residence, Defendant had left the residence and was several blocks away when she was stopped. Def. Motion to Supp. at 9-12.

The government argues that officers had reasonable suspicion to stop the vehicle because officers observed a female driving the truck which left the residence and believed that Silva was working with a female co-conspirator who was his wife. United States Opposition to Motion to Suppress (hereinafter U.S. Opp.) at 9. The government points to the totality of facts known to the officers at the time of the stop as support: (1) Silva and Defendant shared a PO Box in Chico and both used the name "Magana", (2) the red Mustang driven by Silva from the Devonshire address to the site where he delivered methamphetamine to a confidential source on September 20, 2007 was registered to Defendant Magana, (3) a female accompanied Silva to a narcotics test buy on September 20, 2007, (4) on September 27, 2007 the same red Mustang was driven by Silva directly from the Devonshire residence to the site where he provided methamphetamine to a confidential source, (5) no one had come to or left from the Devonshire address on the morning of the September 27th before Silva drove to the site of the sale, (6) Silva was arrested at the transaction site with 2.5 pounds of methamphetamine, (7) before being apprehended Silva attempted to flee and in the process broke his mobile telephone into pieces, and (8) approximately 20-25 minutes after Silva's arrest someone drove a black pickup truck away from the residence. See U.S. Opp. at 9-11.

8

The central issue in this motion is whether law enforcement officers had a legal basis to stop the vehicle driven by Defendant.[2]  <u>Terry</u> and <u>Summers</u> provide independent legal bases for temporarily detaining an individual.  See e.g. <u>United States v. Taylor</u>, 716 F. 2d 701, 707 (th Cir. 1983)(<u>Summers</u> does not justify detention but stop was permissible under <u>Terry</u>).  In this case, the parties agree that <u>Summers</u> does not provide a basis to justify the detention because officers were not at the residence executing a search warrant and even if they were, Magana had already left the residence.  The Court finds, however, that there are sufficient facts in the record to justify the stop under <u>Terry</u>.

I.  Officers Could Reasonably Infer Silva Had a Female Co-Conspirator and that the Co-Conspirator Was Aida Magana.

When Silva arrived at the test buy location on September 24, 2005, he was accompanied by a female, who remained in the vehicle. While this fact may be innocuous to a lay person, it was significant to the trained police officers at the scene.  At the evidentiary hearing, California Bureau of Narcotic Enforcement Special Agent Victor Lacy testified that based on his twelve years of experience as a narcotics investigator, the female's presence at the scene of the test buy was significant because it suggested she was involved in the operation.  Lacey stated that in his experience it is unlikely that a dealer like Silva would bring an uninvolved individual to the scene of a drug transaction.  Transcript at 38.

---

[2] Defendant's motion does not challenge the search of the vehicle which took place after the stop.

9

Based on their training and experience, officers reasonably inferred that the individual in the vehicle was a co-conspirator. Moreover, officers knew that the vehicle driven to the test buy was registered to Defendant Magana. Based on that information and the officers observation that the vehicle's male and female occupants had left from a home that officers believed Defendant and Silva jointly occupied, it was also reasonable for officers to infer that the female present was Defendant Magana.

>    II. Officers had reason to believe that 1865 Devonshire was Silva's "stash" house.

Officers began surveilling the Devonshire Road residence at 8:45 a.m. on the day of the September 27th sale. When Silva left the residence at 10:30 a.m. no vehicles had come to or left the residence. Transcript at 9. When Silva left the residence at 10:30 a.m. he drove directly to the buy location 1.7 miles away with the narcotics which was seized at the time of his arrest. Transcript at 15. Because Silva drove directly from his residence to the buy location, the officers, based on common sense, reasonably concluded that the narcotics came from Silva's residence and that the residence had been used to store the narcotics.

>    III. Silva's destruction of his mobile telephone also provides support for the officers belief he was working with a co-conspirator.

As police moved in to arrest Silva, Silva attempted to flee, and while he was running broke his mobile telephone in half and threw it on the ground. Transcript at 12. While this act might be of unknown significance to a lay person; to the narcotics investigators involved in the investigation this fact provided

10

additional factual support for their belief that Silva may be working with a co-conspirator. Agent Lacey explained that while conducting investigations in the past, on a number of occasions, he has observed narcotics dealers destroy their mobile telephones at the time of an arrest. Lacey testified that the mobile telephone is a primary tool used by narcotics traffickers to communicate with co-conspirators. Transcript at 13, 18. By destroying a telephone, a dealer reduces the chance that law enforcement will locate or intercept a call from a co-conspirator. Transcript at 13.

> IV. Based on facts known to the officers at the time the vehicle left the Devonshire residence after Silva's arrest it was reasonable to infer that the driver may be a co-conspirator.

As is discussed in paragraphs I and II, at the time that officers observed a vehicle leave the Devonshire residence they had a factual basis for believing that: Silva was working with a co-conspirator; that this person was his wife who shared a residence with him; that Silva had driven directly from the residence to the site of the drug sale and his arrest; and that the residence was a stash house for the drugs. These circumstances provided officers with the requisite level of suspicion to stop Defendant. At the evidentiary hearing, Agent Lacey explained the significance of the timing in this case. Lacey stated that from experience he knows that narcotics traffickers recognize that law enforcement will follow up a buy-bust arrest by searching any premises connected to the arrested persons. To counter this they set up contingency plans aimed at protecting such sites. Transcript at 20. Lacey explained that these contingency plans operate on tight time frames

11

and therefore the first 30 minutes or so after a transaction is a critical time window.  In his experience, a dealer will check in with his or her co-conspirator after a completed transaction. Transcript 20-22.  According to Lacy, if the co-conspirator does not hear from his or her crime partners within this critical time window, the co-conspirator will act to protect the drugs and any associated evidence and move it from the stash house to a safe location.  Transcript 22.  In this particular case, as soon as Silva was arrested the officers had ample cause to search the Devonshire residence for drugs, money and other drug trafficking related materials and would have done so as soon as possible.  The Court finds that a vehicle leaving Silva's residence approximately 20-25 minutes after his arrest is consistent with this type of contingency planning by drug trafficers and accordingly, is an additional factor which supports reasonable suspicion in this case.

**Conclusion**

Upon these circumstances, taken as a whole, officers had collective knowledge of articulable facts which objectively supported a reasonable suspicion that Defendant, the driver of the truck, was engaged in criminal conduct.  Accordingly, the stop was reasonable under the Fourth Amendment and Defendant's motion to suppress is denied.

IT IS SO ORDERED

12

Dated: August 16, 2007

D. Lowell Jensen
United States District Judge